CULPEPPER IP, LLLC
Kerry S. Culpepper, Bar No. 9837
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Telephone:  (808) 464-4047
Facsimile:   (202) 204-5181
E-Mail:       kculpepper@culpepperip.com

Attorney for Plaintiff
Hunter Killer Productions, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| Hunter Killer Productions, Inc.,<br><br>        Plaintiff,<br>  vs.<br><br>SABRINA BOYLAN and<br>DOES 1-5<br><br>        Defendants. | **Case No.: 1:20-cv-306**<br>(Copyright)<br><br>**COMPLAINT; EXHIBITS 1-2;**<br>**DECLARATION OF GERALD**<br>**PRADO; DECLARATION OF**<br>**DANIEL ARHEIDT**<br><br>**(1) DIRECT COPYRIGHT**<br>    **INFRINGEMENT**<br>**(2) CONTRIBUTORY**<br>    **COPYRIGHT**<br>    **INFRINGEMENT**<br>**(3) DMCA VIOLATIONS** |

## COMPLAINT

Plaintiff Hunter Killer Productions, Inc. ("Plaintiff") files this Complaint

against Defendants SABRINA BOYLAN ("Boylan") and DOES 1-5 (collectively

"Defendants") and alleges as follows:

### I.      NATURE OF THE ACTION

20-017C

1.     This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.     The Plaintiff alleges that Defendants are liable for: (1) direct and contributory copyright infringement in violation of 17 U.S.C. §§ 106 and 501; and (2) violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

4.     Defendants either reside in, solicit, transact, or are doing business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.  As such, Defendants have sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over them.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; and, (b) the Defendants reside, and therefore can be found, in this State.  Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents reside or may be found in this District.

20-017G

### III.   PARTIES

### A.   The Plaintiff

6.     The Plaintiff Hunter Killer Productions, Inc. is a corporation organized and existing under the laws of the State of Nevada.

7.     The Plaintiff is the owner of the copyright for the motion picture in the Work "*Hunter Killer*", (hereafter: the "Work") a major motion picture released in 2018.

8.     The Work is an action movie starring Gerard Butler, Gary Oldman, Common, and Linda Cardellini.  The Work tells the story of American submarine Captain Joe Glass on the hunt for a U.S. submarine in distress when he discovers a secret Russian coup which threatens to dismantle the world order.

### B.  The Defendants

9.     Each Defendant used a website known as YTS ("YTS website") either directly or via a BitTorrent Client such as Popcorn Time to download a torrent file for copying the Work.

10.     The YTS website is currently accessible at YTS.MX and was previously accessible at YTS.AM, YTS.AG and YTS.LT.

11.     The YTS website is known for distributing torrent files of copyright protected motion pictures.





12.    In stipulated judgments resolving lawsuits filed in the District of Hawaii, the operators of the YTS website, Senthil Segaran and Techmodo Limited, conceded that one or more third parties uploaded torrent files of the motion pictures

*Once Upon a Time in Venice*, *Mechanic: Resurrection*, *Hunter Killer*, *Extremely Wicked Shockingly Evil and Vile*, and *Hellboy* to the YTS website and that the YTS website provided links for distributing the torrent files. *See Venice PI, LLC et al. v. NGUYEN DINH MANH, et al.*, 1:19-cv-169-LEK-KJM, Doc. #77; *Wicked Nevada, LLC vs. Senthil Vijay Segaran*, 1:19-cv-413-SOM-KJM, Doc. #25; and *HB Productions, Inc. vs. Senthil Vijay Segaran*, 1:19-cv-389-ACK-KJM, Doc. #51.

13.     The Defendants are members of a group of BitTorrent users or peers whose computers are collectively interconnected for the sharing of a particular unique file, otherwise known as a "swarm".  The particular file a BitTorrent swarm is associated with has a unique "hash" number and a file name.

14.     Upon information and believe, each of the Defendants received from Plaintiff's agent at least a first notice per 17 U.S.C. 512(a) of the Digital Millennium Copyright Act ("DMCA notice") requesting the individual to stop infringement of the Work or other Works via BitTorrent protocol.

## **Defendant Boylan**

15.     Upon information and belief, Defendant Boylan is an adult female over 21 years of age and a resident of El Paso, TX.

16.     Defendant Boylan was previously an employee of a Verizon branded store doing business as VICTRA selling telecommunication equipment such as cell phones, tablet devices and/or computing devices to members of the general public

20-017G

at the VICTRA location in El Paso, TX ("TX Store").

17.    As an employee of VICTRA, Boylan assisted in or performed installation and/or set up of said cell phones, tablet devices and computing devices for said members of the general public at the TX Store.

18.    Upon information and belief, Defendant Boylan was terminated as an employee of the TX Store for promoting and distributing movie piracy apps to customers at the TX Store.

19.    Defendant Boylan was a Verizon subscriber assigned the Internet Protocol ("IP") address 174.237.5.2 on 2019-12-27 11:31:00 UTC by Internet Service Provider ("ISP") Verizon.

20.    An IP address is a number that is assigned by the ISP to devices, such as computers or cell phones, that are connected to the Internet.

21.    Upon information and belief, Defendant Boylan downloaded a torrent file for the Work from the YTS website either directly or via a BitTorrent Client app.

22.    Defendant Boylan downloaded, reproduced and shared copies of the Work under the file name "Hunter Killer (2018) [WEBRip] [720p] [YTS.AM]" multiple times on December 27, 2019 from the IP address 174.237.5.2.

23.    Defendant Boylan used a computer device connected to Verizon's cellular phone Internet service.  Because Verizon's cellular phone Internet service

20-017G

was used, it is highly unlikely a third party was able to obtain the consistent access for the observed activity through hacking or any other means to the account of Defendant Boylan.

## Defendants DOES 1-5

24.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1-5 are unknown to Plaintiff who therefore sues said Defendants DOES 1-5 by such fictitious names.  Each of Defendants DOES 1-5 is known to the Plaintiff only by an IP address at which the alleged infringement took place.  The ISP to which a Defendant subscribes or uses can correlate a Defendant's IP address to a Defendant's true identity.  As shown on Exhibit "1" attached hereto, each of the Defendants' acts of copyright infringement occurred using an IP address traced to a physical address located within this District.  Plaintiff intends to subpoena the ISPs that issued the IP addresses in order to learn the identities of the account holders for the IP addresses.  Often the account holder will be a proper Defendant in this case.  However, further discovery may be necessary in some circumstances in order to be certain of the identity of the proper Defendant. Plaintiff believes that information obtained in discovery will lead to the identification of each Defendants' true name and permit the Plaintiff to amend this Complaint to state the same.  Plaintiff further believes that the information obtained in discovery may lead to the identification of additional infringing parties to be

20-017G

added to this Complaint as defendants.  Plaintiff will amend this Complaint to include the proper names and capacities when they have been determined.  Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants participated in and are responsible for the acts described in this Complaint and damages resulting therefrom.

25.    Plaintiff alleges on information and belief that each of the Defendants named herein performed, participated in, or abetted in some manner, the acts alleged herein, proximately caused the damages alleged herein, and are liable to Plaintiff for the damages and relief sought herein.

## IV.    JOINDER

26.    Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiff asserts that the infringements complained of herein by each of the Defendants was part of a series of transactions over the course of a relatively short period of time, involving the exact same piece of the Plaintiff's copyrighted Work, and was accomplished by the Defendants acting in concert with each other; and there are common questions of law and fact.  Further, each of Defendants obtained the torrent file associated with the Work either directly or indirectly from the YTS website.

## V.    FACTUAL BACKGROUND

### A. The Plaintiff Owns the Copyright to the Work

8

20-017G

27.    The Plaintiff is the owner of the copyright for the screenplay and motion picture for the Work entitled "*Hunter Killer*", a major motion picture released in 2018.

28.    The Work is the subject of copyright registration (Registration Number PA0002147752) for the motion picture and (Registration Number PAu003868948) for the screenplay, and this action is brought pursuant to 17 U.S.C. § 411.  *See* Exhibit "2".

29.    The Work is a motion picture which contains original material that is copyrightable subject matter under the laws of the United States.

30.    The Work is currently offered for sale in commerce.

31.    The YTS website provides torrent files, many including the name "YTS" in their file names, that can be used by a BitTorrent protocol client application to download copyright protected content, including Plaintiff's Work.

32.    Defendants used the YTS website to download the torrent file associated with Plaintiff's Work.

33.    The Defendants knew the torrent files they downloaded would be used to illegally download and share copies of the Work.

34.    The YTS website displays, "WARNING! Download only with VPN…" and further information warning users that their IP address is being tracked by the ISP and encouraging them to protect themselves from expensive lawsuits by

purchasing service from a VPN on its homepage.  Upon information and belief, this

warning has appeared on the YTS website since at least 2018.



35.     The term of use of the YTS website explicitly prohibit individuals in

the United States of America from accessing or using the YTS website.  Upon

information and belief, this restriction has been included in the terms of the YTS

website   since   at   least   October   of   2019.     *See*   Internet   Archive,

https://web.archive.org/web/20191001181723/https://yts.lt/terms [last accessed on

September 25, 2020].



### B. Defendants Used BitTorrent to Infringe the Plaintiff's Copyright

36.     BitTorrent   is   one   of   the   most   common   peer-to-peer   file   sharing

protocols (in other words, set of computer rules) used for distributing large amounts

of data.

37.     The BitTorrent protocol's popularity stems from its ability to distribute

a large file without creating a heavy load on the source computer and network. In

short, to reduce the load on the source computer, rather than downloading a file

20-017G

from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

### 1. Each Defendant installed a BitTorrent Client onto his or her Computer

38.    A BitTorrent Client is a software program that implements the BitTorrent Protocol.  There are numerous such software programs which can be directly downloaded from the Internet.

39.    Once installed on a computer, the BitTorrent Client serves as the user's interface during the process of uploading and downloading data using the BitTorrent protocol.

40.    Defendants installed a BitTorrent Client onto their respective computers.

41.    Defendant Boylan had the BitTorrent Client "Popcorn Time" installed on her device.

### 2. The Initial Seed, Torrent, Hash and Tracker

42.    A BitTorrent user that wants to upload a new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using the Client he or she installed onto his or her computer.

11

43.    The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

44.    The initial seeder often modifies the file title of the Work to include a wording such as "RARBG" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

45.    The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

46.    The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Work, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

47.    When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

48.    Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash

20-017G

identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

49.    The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

50.    The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

51.    Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 3. Torrent Sites

52.    "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites.

53.    Upon information and belief, Defendants went to a torrent site to upload and download Plaintiff's copyrighted Work.

54.    Upon information and belief, Defendants went to the torrent site YTS to download Plaintiff's copyrighted Work.

### 4. Uploading and Downloading a Work Through a BitTorrent Swarm

13

55.    Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

56.    The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.

57.    Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.

58.    In this way, all of the peers and seeders are working together in what is called a "swarm."

59.    Here, Defendants participated in the same swarm and directly interacted and communicated with other members of that swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions.

60.    In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Work here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to

20-017G

the other peers in the same swarm.

61.    Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

### 5. *The Plaintiff's Computer Investigator Identified the Defendants' IP Addresses as Participants in a Swarm That Was Distributing the Plaintiff's Copyrighted Work*

62.    The Plaintiff retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiff's copyrighted Work.

63.    MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

64.    MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

65.    The IP addresses, Unique Hash Number, and hit dates contained on Exhibit "1" accurately reflect what is contained in the evidence logs, and show that

20-017G

Defendants have copied a piece of the Plaintiff's copyrighted Work identified by the Unique Hash Number.

66.    The Defendants' computers used the identified IP addresses to connect to the investigative server from a computer in this District in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

67.    MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses listed on Exhibit "1" and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Work.

68.    MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

***C. Defendants knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiff.***

69.    A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

70.    The initial seeder of the infringing file copies of Plaintiff's Work added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

16

71.    For example, the initial seeder of the infringing file copies of the Work added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

72.    The word YTS is not included in the file title of legitimate copies or streams of the Plaintiff's Work.  The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

73.    The file copies Defendants distributed to other peers in the Swarm included the altered CMI in the file title.

74.    Defendants knew that the website from which they obtained their torrent files was distributing illegal copies of the Work.

75.    Defendants knew that YTS was not the author of Plaintiff's Work.

76.    Defendants knew that YTS was not a licensed distributor of Plaintiff's Work.  Indeed, the YTS website includes a warning to this effect.

77.    Defendants knew that the CMI that included YTS in the file names was false.

78.    Defendants knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Work when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

79.    Namely, Defendants knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent

20-017G

files originated to obtained unlicensed copies of the Work.

80.    By providing the website in the altered CMI to others, Defendants induced, enabled and facilitated further infringements of the Work.

**D.    Defendant Boylan promoted and distributed the BitTorrent Client "Popcorn Time" to her customers from the TX store.**

81.    Defendant Boylan promoted movie piracy apps at the VICTRA TX Store to her customers for the purposes of infringing copyright protected content.

82.    Defendant Boylan explained to her customers how to use the movie piracy apps installed onto the customers' devices to infringe copyright protected content including Plaintiff's while the customers were at VICTRA stores.

83.    Defendant Boylan's customers used said movie piracy apps exactly as explained to them by Defendant Boylan – to infringe copyright protected content.

84.    Defendant Boylan promoted the movie piracy apps to her customers to entice them to purchase particular products and thereby increase her own compensation.

85.    Defendant Boylan promoted Popcorn Time by telling members of the general public, including Gerard Prado, that it could be used to watch "free movies" at the TX Store on or around March 5, 2019.

86.    Based upon Defendant Boylan's encouragement that a Samsung T387 Galaxy Tablet device could be used to watch free movies, Gerard Prado decided to

20-017G

purchase the Tablet device.

87.     Defendant Boylan installed Popcorn Time on the tablet device of Gerard Prado while he was at the TX Store so that Gerard Prado could watch content in violation of copyright laws (i.e., "free movies").

88.     Gerard Prado used Popcorn Time on the tablet device to download at least a portion of the Plaintiff's Work exactly as instructed by Defendant Boylan.

89.     Defendant Boylan knew or had reason to know that using Popcorn Time would result in direct infringement of the Copyrights of specific material.

90.     Defendant Boylan was promptly terminated by VICTRA when informed of her conduct.

## VI. FIRST CLAIM FOR RELIEF

## (Copyright Infringement)

91.     Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

92.     Plaintiff is the copyright owner of the Work which contains an original work of authorship.

93.     Defendants copied the constituent elements of the copyright protected Work.

94.     Defendants also publicly performed and displayed the copyright protected Work.

20-017G

95.     By participating in the BitTorrent swarms with others, Defendants distributed at least a piece of each of the copyright protected Work to others.

96.     Plaintiff did not authorize, permit, or provide consent to Defendants to copy, reproduce, distribute, publicly perform, or display its Work.

97.     As a result of the foregoing, Defendants violated the Plaintiff's exclusive right to reproduce the Work in copies, in violation of 17 U.S.C. §§ 106(1) and 501.

98.     As a result of the foregoing, Defendants violated the Plaintiff's exclusive right to distribute copies of the Work in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

99.     As a result of the foregoing, Defendants violated the Plaintiff's exclusive rights to perform the Work publicly, in violation of 17 U.S.C. §§ 106(4) and 501.

100.   Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

101.   The Plaintiff has suffered damages that were proximately caused by the Defendants' copyright infringement including, but not limited to lost sales, price erosion, and a diminution of the value of its copyright.

## VII. SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement against Boylan only)

20

102.   Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

103.   Defendant Boylan intentionally induced the infringement of Plaintiff's exclusive rights under the Copyright Act, including infringement of Plaintiff's exclusive right to publicly perform and distribute copies of the Copyrighted Work.

104.   As intended and encouraged by Defendant Boylan, Popcorn Time connects users to sources that publicly perform and/or distribute copies of Plaintiff's Copyrighted Work.   The operators of these sources directly infringe Plaintiff's exclusive rights by providing unauthorized streams and/or copies of the Work to the public, including to Defendant Boylan's customers such as Gerard Prado.

105.   Once Defendant Boylan's customer have obtained a complete copy of the Plaintiff's Copyrighted Work, that particular customer also becomes another Torrent source that delivers copies of Plaintiff's Copyrighted Work.

106.   Defendant Boylan induces the aforementioned acts of infringement by supplying the movie piracy apps such as Popcorn Time that facilitate, enable, and create direct links between her customers and the infringing sources, and by actively inducing, encouraging and promoting the movie piracy app for blatant copyright infringement.

107.   Defendant Boylan's intentional inducement of the infringement of Plaintiff's rights in its Copyrighted Work constitutes a separate and distinct act of

20-017G

infringement.

## VIII. THIRD CLAIM FOR RELIEF

### (Contributory Copyright Infringement against all Defendants)

108.   Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

109.   By participating in the BitTorrent swarms with others, Defendants induced, caused or materially contributed to the infringing conduct of the copyright protected Work by others.

110.   By participating in the BitTorrent swarms with others, Defendants further induced, caused or materially contributed to the infringing conduct of the copyright protected Work by others.

111.   Plaintiff did not authorize, permit, or provide consent to the Defendants inducing, causing, or materially contributing to the infringing conduct of others.

112.   Defendants knew or should have known that the other BitTorrent users in a swarm with them were directly infringing the Plaintiff's copyrighted Work by copying constituent elements of the registered Work that is original.   Indeed, Defendants directly participated in and therefore materially contributed to others' infringing activities.

113.   The Defendants' infringements were committed "willfully" within the

meaning of 17 U.S.C. § 504(c)(2).

114.   By engaging in the contributory infringement alleged in this Complaint, the Defendants deprived not only the producers of the Work from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  The Defendants' misconduct therefore offends public policy.

## IX. FOURTH CLAIM FOR RELIEF

## (Digital Millennium Copyright Act Violations)

115.   Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

116.   Defendants knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Work distributed copyright management information ("CMI") that falsely included the wording "YTS" in violation of 17 U.S.C. § 1202(a)(2).

117.   Defendants, without the authority of Plaintiff or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include the wording "YTS" without the authority of the Plaintiff and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal

infringement of Plaintiff's Copyright protected Work in violation of 17 U.S.C. § 1202(b)(2).

118.   Defendants, without the authority of Plaintiff or the law, distributed Plaintiff's Copyright protected Work knowing that the CMI had been removed or altered to include the wording "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Work in violation of 17 U.S.C. § 1202(b)(3).

119.   Particularly, the Defendants knew that the CMI in the file names of the pieces had been altered to include the wording "YTS".

120.   Particularly, the Defendants distributed the file names that included CMI that had been altered to include the wording "YTS".

121.   Defendants knew that the wording "YTS" originated from the notorious movie piracy website for which each had registered accounts.

122.   Defendants' acts constitute violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

123.   Plaintiff is entitled to an injunction to prevent Defendants from engaging in further violations of 17 U.S.C. § 1202.

124.   Plaintiff is entitled to recover from Defendants the actual damages suffered by Plaintiff and any profits Defendants have obtained as a result of their wrongful acts that are not taken into account in computing the actual damages.

Plaintiff is currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

125.   Plaintiff is entitled to elect to recover from Defendants statutory damages for their violations of 17 U.S.C. § 1202.

126.   Plaintiff is further entitled to costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court:

(A) permanently enjoin Defendants from continuing to infringe the Plaintiff's copyrighted Work;

(B) order that Defendants delete and permanently remove the torrent file relating to the Plaintiff's copyrighted Work and the BitTorrent Client from each of the computers under Defendants' possession, custody, or control;

(C) order that Defendants delete and permanently remove the copy of the Work Defendants have on the computers under the Defendants' possession, custody, or control;

(D) award the Plaintiff either its actual damages and any additional profits of the Defendants pursuant to 17 U.S.C. § 504(a)-(b) or statutory damages per Defendant pursuant to 17 U.S.C. § 504-(a) and (c), whichever is greater;

(E) award the Plaintiff its reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

20-017G

(F) grant the Plaintiff any and all other and further relief that this Court deems just and proper.

The Plaintiff hereby demands a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, December 9, 2020.


CULPEPPER IP, LLLC

/s/ Kerry S. Culpepper
Kerry S. Culpepper
Attorney for Plaintiff

26

20-017G