FILED

MAY 0 5 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

CULPEPPER IP, LLLC
Kerry S. Culpepper, Bar No. 9837
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Telephone:   (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:       kculpepper@culpepperip.com

Attorney for Plaintiffs:
Hunter Killer Productions, Inc.;
Bodyguard Productions, Inc.;
Morgan Creek Productions, Inc.;
Voltage Holdings, LLC; and
Rambo V Productions, Inc.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| Hunter Killer Productions, Inc.,<br>Bodyguard Productions, Inc.,<br>Morgan Creek Productions, Inc.,<br>Voltage Holdings, LLC; and<br>Rambo V Productions, Inc.<br><br>Plaintiffs,<br>vs.<br><br>SABRINA BOYLAN<br><br>Defendant. | **Case No.: 3:20-CV-00306-FM**<br>(Copyright)<br><br>**FIRST AMENDED COMPLAINT;**<br>**EXHIBITS 1-2; DECLARATION**<br>**OF GERALD PRADO; SECOND**<br>**DECLARATION OF DANIEL**<br>**ARHEIDT**<br><br>**(1) DIRECT COPYRIGHT**<br>    **INFRINGEMENT**<br>**(2) CONTRIBUTORY**<br>    **COPYRIGHT**<br>    **INFRINGEMENT**<br>**(3) DMCA VIOLATIONS** |

## FIRST AMENDED COMPLAINT

Plaintiffs Hunter Killer Productions, Inc., Bodyguard Productions, Inc.,

20-017G

Morgan Creek Productions, Inc., Voltage Holdings, LLC, and Rambo V Productions, Inc., ("Plaintiffs") file this First Amended Complaint against Defendant SABRINA BOYLAN ("Defendant") and allege as follows:

## I.    NATURE OF THE ACTION

1.    This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.    The Plaintiffs allege that Defendant is liable for: (1)-(2) direct and contributory copyright infringement in violation of 17 U.S.C. §§ 106 and 501; and (3) violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

## II.    JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

4.    Defendant either resides in, solicits, transacts, or is doing business within this jurisdiction, and has committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that her acts would cause injury in this jurisdiction.  As such, Defendant has sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over her.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the

20-017G

claims occurred in this District; and, (b) the Defendant resides, and therefore can be found, in this State.  Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendant or Defendant's agents reside or may be found in this District.

### III.   PARTIES

#### A.  The Plaintiff

6.      The Plaintiffs Hunter Killer Productions, Inc. (Hunter Killer), Bodyguard Productions, Inc. (Bodyguard) and Rambo V Productions, Inc. ("Rambo") are corporations organized and existing under the laws of the State of Nevada.

7.      Hunter Killer is the owner of the copyrights for the motion picture in the Work "*Hunter Killer*".

8.      Bodyguard is the owner of the copyrights for the motion picture in the Work "*The Hitman's Bodyguard*".

9.      Rambo is the owner of the copyright for the motion picture in the Work "*Rambo V: Last Blood*".

10.     The Plaintiff Morgan Creek Productions, Inc. ("Morgan Creek") is a corporation organized and existing under the laws of the State of Maryland.  Morgan Creek is the owner of the copyrights for the motion picture "*All Eyez on Me*".

11.     The Plaintiff Voltage Holdings, LLC ("Voltage") is a limited liability

20-017G

company organized and existing under the laws of the State of Nevada.

12.     Voltage is the owner of the copyright for the motion picture in the Work "*Extremely Wicked, Shockingly Vile and Evil*".

### B.  The Defendant

13.     Defendant is an adult female over 21 years of age and a resident of El Paso, TX.

14.     Defendant was previously an employee of a Verizon branded store doing business as VICTRA selling telecommunication equipment such as cell phones, tablet devices and/or computing devices to members of the general public at the VICTRA location in El Paso, TX ("TX Store").

15.     As an employee of VICTRA, Defendant assisted in or performed installation and/or set up of said cell phones, tablet devices and computing devices for said members of the general public at the TX Store.

16.     Defendant was terminated as an employee of the TX Store for promoting and distributing movie piracy applications to customers at the TX Store.

17.     Defendant was a Verizon subscriber assigned Internet Protocol ("IP") addresses by the Internet Service Provider ("ISP") Verizon.

18.     An IP address is a number that is assigned by the ISP to devices, such as computers or cell phones, that are connected to the Internet.

19.     Defendant used piracy websites such as RARBG and YTS either

4

20-017G

directly or via a movie piracy application such as Popcorn Time to download torrent files for copying the Works Hunter Killer.

20.    The RARBG website is so notorious that the United States Trade Representative ("USTR") placed it on a list of examples of Notorious Markets engaged in and facilitating substantial piracy. *See* USTR, 2018 Out-of-Cycle Review of Notorious Markets, April 2019, pgs. 24, 27-28, Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [last accessed on April 26, 2021].

21.    The YTS website is currently accessible at YTS.MX and was previously accessible at YTS.AM, YTS.AG and YTS.LT.

22.    The YTS website is known for distributing torrent files of copyright protected motion pictures.

20-017G





23.    In stipulated judgments resolving lawsuits filed in the District of Hawaii, the operators of the YTS website, Senthil Segaran and Techmodo Limited, conceded that one or more third parties uploaded torrent files of the motion pictures

20-017G

*Once Upon a Time in Venice*, *Mechanic: Resurrection*, *Hunter Killer*, *Extremely Wicked Shockingly Evil and Vile*, and *Hellboy* to the YTS website and that the YTS website provided links for distributing the torrent files. *See Venice PI, LLC et al. v. NGUYEN DINH MANH, et al.*, 1:19-cv-169-LEK-KJM, Doc. #77; *Wicked Nevada, LLC vs. Senthil Vijay Segaran*, 1:19-cv-413-SOM-KJM, Doc. #25; and *HB Productions, Inc. vs. Senthil Vijay Segaran*, 1:19-cv-389-ACK-KJM, Doc. #51.

24.     Defendant is a member of a group of BitTorrent users or peers whose computers are collectively interconnected for the sharing of a particular unique file, otherwise known as a "swarm". The particular file a BitTorrent swarm is associated with has a unique "hash" number and a file name.

25.     Upon information and believe, Defendant received from Plaintiffs' agent at least a first notice per 17 U.S.C. 512(a) of the Digital Millennium Copyright Act ("DMCA notice") requesting her to stop infringement of the Works via BitTorrent protocol.

26.     Defendant downloaded, reproduced and shared copies of the Work *Hunter Killer* under the file name "Hunter Killer (2018) [WEBRip] [720p] [YTS.AM]" multiple times on December 27, 2019 from the IP address 174.237.5.2. *See* Exhibit "1".

27.     Defendant downloaded, reproduced and shared copies of the Work *All Eyez        on        Me*        under        the        file        name

7

"All.Eyez.on.Me.2017.PROPER.1080p.BluRay.H264.AAC-RARBG" multiple times on April 5, 2019 from the IP address 174.237.5.236. *See* Exhibit "1".

28.     Defendant downloaded, reproduced and shared copies of the Work *The Hitman's Bodyguard* under the file name "The.Hitmans.BodyGuard.2017.BRRip.XviD.AC3-RARBG" multiple times on April 5, 2019 from the IP address 174.237.5.236. *See* Exhibit "1".

29.     Defendant downloaded, reproduced and shared copies of the Work *Extremely Wicked, Shockingly Evil and Vile* under the file name "Extremely.Wicked.Shockingly.Evil.and.Vile.2019.1080p.NF.WEBRip.DDP5.1.x 264-CM" multiple times on July 23, 2019 from the IP address 174.237.6.149. *See* Exhibit "1".

30.     Defendant downloaded, reproduced and shared copies of the Work *Rambo V: Last Blood* under the file name "Rambo.Last.Blood.2019.KORSUB.HDRip.x264-STUTTERSHIT" on Nov. 22, 2019 from the IP address 174.237.138.135. *See* Exhibit "1".

31.     Defendant used a computer device connected to Verizon's cellular phone Internet service. Because Verizon's cellular phone Internet service was used, it is highly unlikely a third party was able to obtain the consistent access for the observed activity through hacking or any other means to the account of Defendant.

### IV.   JOINDER

8

20-017G

32.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs was properly joined because, as set forth in more detail below, the Plaintiffs assert that the infringements complained of herein by Defendant were part of a series of transactions and occurrences involving Defendant, namely Defendant's use of the piracy application Popcorn Time and her promotion and distribution of this piracy application to others.

## V.     FACTUAL BACKGROUND

### A. The Plaintiffs Own the Copyright to the Work

33.     As shown in Exhibit "2", the Plaintiffs are the registered owners of the copyrights for the Works.

34.     Each of the Works contains original material that is copyrightable subject matter under the laws of the United States.

35.     The Works are currently offered for sale in commerce.

36.     The YTS website provides torrent files, many including the name "YTS" in their file names, that can be used by a BitTorrent protocol client application to download copyright protected content, including Plaintiffs' Works.

37.     The RARBG website provides torrent files, many including the name "RARBG" in their file names, that can be used by a BitTorrent protocol client application to download copyright protected content, including Plaintiffs' Works.

38.     Defendant used the YTS and RARBG websites to download the torrent

20-017G

file associated with Plaintiffs' Works *Hunter Killer*, *All Eyez on Me* and *The Hitman's Bodyguard*.

39.     The Defendant knew the torrent files she downloaded would be used to illegally download and share copies of the Work.

40.     The YTS website displays, "WARNING! Download only with VPN…" and further information warning users that their IP address is being tracked by the ISP and encouraging them to protect themselves from expensive lawsuits by purchasing service from a VPN on its homepage. Upon information and belief, this warning has appeared on the YTS website since at least 2018.



41.     The term of use of the YTS website explicitly prohibit individuals in the United States of America from accessing or using the YTS website. Upon information and belief, this restriction has been included in the terms of the YTS website since at least October of 2019. *See* Internet Archive, https://web.archive.org/web/20191001181723/https://yts.lt/terms [last accessed on September 25, 2020].

20-017G

### *B. Defendant Used BitTorrent to Infringe the Plaintiffs' Copyrights*

42.     BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

43.     The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

### *1. Defendant installed a BitTorrent Client onto his or her Computer*

44.     A BitTorrent Client is a software program that implements the BitTorrent Protocol.  There are numerous such software programs which can be directly downloaded from the Internet.

45.     Once installed on a computer, the BitTorrent Client serves as the user's interface during the process of uploading and downloading data using the BitTorrent protocol.

46.     Defendant installed a BitTorrent Client onto their respective

11

computers.

47.     Defendant Boylan had the BitTorrent Client "Popcorn Time" installed on her device.

### 2. The Initial Seed, Torrent, Hash and Tracker

48.     A BitTorrent user that wants to upload a new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using the Client he or she installed onto his or her computer.

49.     The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

50.     The initial seeder often modifies the file title of the Work to include a wording such as "RARBG", "STUTTERSH*T" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

51.     The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

52.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Work, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

53.     When another peer later receives a particular piece, the hash identifier

20-017G

for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

54.     Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

55.     The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

56.     The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

57.     Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 3. Torrent Sites

58.     "Torrent sites" are websites that index torrent files that are currently

20-017G

being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites.

59.     Upon information and belief, Defendant went to a torrent site to upload and download Plaintiff's copyrighted Work.

60.     Upon information and belief, Defendant went to the torrent sites YTS and RARBG to download Plaintiffs' copyrighted Works.

### 4. Uploading and Downloading a Work Through a BitTorrent Swarm

61.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

62.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.

63.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.

64.     In this way, all of the peers and seeders are working together in what is called a "swarm."

65.     Here, Defendant participated in swarms with others and directly interacted and communicated with other members of that respective swarm through

14

digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions.

66.    In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Works to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

67.    Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

### 5. The Plaintiffs' Computer Investigator Identified the Defendant's IP Addresses as Participants in a Swarm That Was Distributing the Plaintiffs' Copyrighted Works.

68.    The Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiff's copyrighted Work.

69.    MEU used forensic software to enable the scanning of peer-to-peer

15

networks for the presence of infringing transactions.

70.     MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

71.     The IP addresses, Unique Hash Number, and hit dates contained on Exhibit "1" accurately reflect what is contained in the evidence logs, and show that Defendant copied a piece of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.  *See* Second Decl. of Daniel Arheidt at ¶7.

72.     The Defendant's computer used the identified IP addresses to connect to the investigative server from a computer in this District in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

73.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses listed on Exhibit "1" and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Work. *See* id.

74.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

20-017G

*C. Defendant knew the Copyright Management Information included in the files she distributed to other peers had been removed or altered without the authority of Plaintiffs.*

75.     A legitimate file copy of the Work includes copyright management information ("CMI") indicating the title.

76.     The initial seeder of the infringing file copies of Plaintiffs' Works added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

77.     For example, the initial seeder of the infringing file copies of the Work added the wording "YTS" to the file title of *Hunter Killer* to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

78.     The word YTS is not included in the file title of legitimate copies or streams of the Plaintiff Hunter Killer's Work. The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

79.     The file copies Defendant distributed to other peers in the Swarm included the altered CMI in the file title.

80.     Defendant knew that the website from which she obtained her torrent files was distributing illegal copies of the Work.

81.     Defendant knew that YTS, STUTTERSH*T and/or RARBG were not the authors of Plaintiffs' Works.

20-017G

82.   Defendant knew that YTS, STUTTERSH*T and RARBG were not licensed distributors of Plaintiffs' Works.  Indeed, the YTS website includes a warning to this effect.

83.   Defendant knew that the CMI that included YTS, RARBG and STUTTERSH*T in the file names was false.

84.   Defendant knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Work when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

85.   Namely, Defendant knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

86.   By providing the website in the altered CMI to others, Defendant induced, enabled and facilitated further infringements of the Work.

**D.  Defendant promoted and distributed the BitTorrent Client "Popcorn Time" to her customers from the TX store.**

87.   Defendant promoted movie piracy applications at the VICTRA TX Store to her customers for the purposes of infringing copyright protected content.

88.   Defendant explained to her customers how to use the movie piracy applications installed onto the customers' devices to infringe copyright protected content including Plaintiff's while the customers were at VICTRA stores.

20-017G

89.     Defendant's customers used said the movie piracy applications exactly as explained to them by Defendant – to infringe copyright protected content.

90.     Defendant promoted the movie piracy applications to her customers to entice them to purchase particular products and thereby increase her own compensation.

91.     Defendant promoted Popcorn Time by telling members of the general public, including Gerard Prado, that it could be used to watch "free movies" at the TX Store on or around March 5, 2019.  *See* Decl. of Gerard Prado at ¶¶4-9.

92.     Based upon Defendant's encouragement that a Samsung T387 Galaxy Tablet device could be used to watch free movies, Gerard Prado decided to purchase the Tablet device.  *See* id.

93.     Defendant installed Popcorn Time on the tablet device of Gerard Prado while he was at the TX Store so that Gerard Prado could watch content in violation of copyright laws (i.e., "free movies").  *See* id.

94.     Gerard Prado used Popcorn Time on the tablet device to download at least a portion of the Plaintiff Hunter Killer's Work *Hunter Killer* exactly as instructed by Defendant.  *See* id.

95.     Defendant knew or had reason to know that using Popcorn Time would result in direct infringement of the Copyrights of specific material.

96.     Defendant was promptly terminated by VICTRA in October of 2019

20-017G

when informed of her conduct.

## VI. FIRST CLAIM FOR RELIEF
### (Copyright Infringement)

97.     Plaintiffs re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

98.     Plaintiffs are the copyright owner of the Works, each of which contains an original work of authorship.

99.     Defendant copied the constituent elements of the copyright protected Works.

100.    Defendant also publicly performed and displayed the copyright protected Works.

101.    By participating in the BitTorrent swarms with others, Defendant distributed at least a piece of each of the copyright protected Works to others.

102.    Plaintiffs did not authorize, permit, or provide consent to Defendant to copy, reproduce, distribute, publicly perform, or display their Works.

103.    As a result of the foregoing, Defendant violated the Plaintiffs' exclusive right to reproduce the Works in copies, in violation of 17 U.S.C. §§ 106(1) and 501.

104.    As a result of the foregoing, Defendant violated the Plaintiffs' exclusive right to distribute copies of the Works in copies, in violation of 17 U.S.C. §§ 106(3) and 501.

20

20-017G

105.   As a result of the foregoing, Defendant violated the Plaintiffs' exclusive right to perform the Works publicly, in violation of 17 U.S.C. §§ 106(4) and 501.

106.   Defendant's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

107.   The Plaintiffs have suffered damages that were proximately caused by the Defendant's copyright infringements including, but not limited to lost sales, price erosion, and a diminution of the value of their copyright.

## VII. SECOND CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon intentional inducement)

108.   Plaintiff Hunter Killer re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

109.   Defendant intentionally induced the infringement of Plaintiff Hunter Killer's exclusive rights under the Copyright Act, including infringement of Plaintiff Hunter Killer's exclusive rights to reproduce, publicly perform and distribute copies of the Copyrighted Work.

110.   As intended and encouraged by Defendant, Popcorn Time connects users to sources that publicly perform and/or distribute copies of Plaintiff's Copyrighted Work *Hunter Killer*.  The operators of these sources directly infringe Plaintiff's exclusive rights by providing unauthorized streams and/or copies of the Work to the public, including to Defendant's customers such as Gerard Prado.

21

20-017G

111. Once Defendant's customers have obtained a complete copy of the Plaintiff's Copyrighted Work, that particular customer also becomes another Torrent source that delivers copies of Plaintiff's Copyrighted Work.

112. Defendant induces the aforementioned acts of infringement by supplying the movie piracy applications such as Popcorn Time that facilitate, enable, and create direct links between her customers and the infringing sources, and by actively inducing, encouraging and promoting the movie piracy application for blatant copyright infringement.

113. Defendant's intentional inducement of the infringement of Plaintiff Hunter Killer's rights in its Copyrighted Work constitutes a separate and distinct act of infringement.

## VIII. THIRD CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon material contribution)

114. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

115. By participating in the BitTorrent swarms with others, Defendant induced, caused or materially contributed to the infringing conduct of the copyright protected Works by others.

116. By participating in the BitTorrent swarms with others, Defendant further induced, caused or materially contributed to the infringing conduct of the copyright protected Works by others.

20-017G

117. Plaintiffs did not authorize, permit, or provide consent to the Defendant inducing, causing, or materially contributing to the infringing conduct of others.

118. Defendant knew or should have known that the other BitTorrent users in a swarm with her were directly infringing the Plaintiffs' copyrighted Works by copying constituent elements of the registered Work that is original. Indeed, Defendant directly participated in and therefore materially contributed to others' infringing activities.

119. The Defendant's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

120. By engaging in the contributory infringement alleged in this First Amended Complaint, the Defendant deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy. The Defendant's misconduct therefore offends public policy.

## IX. FOURTH CLAIM FOR RELIEF

## (Digital Millennium Copyright Act Violations)

20-017G

121.   Plaintiffs Hunter Killer, Bodyguard, Morgan Creek and Rambo re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

122.   Defendant knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works distributed copyright management information ("CMI") that falsely included the wording "YTS" for the Work *Hunter Killer*, "RARBG" for the Works *Hitman's Bodyguard* and *All Eyez on Me* and "STUTTERSH*T" for *Rambo V: Last Blood* in violation of 17 U.S.C. § 1202(a)(2).

123.   Defendant, without the authority of Plaintiffs or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include the wordings "YTS", "RARBG" and "STUTTERSH*T" without the authority of the Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs' Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

124.   Defendant, without the authority of Plaintiffs or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include the wording "YTS", "RARBG" and "STUTTERSH*T", and knowing, or having reasonable grounds to know, that it will induce, enable,

20-017G

facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

125.   Particularly, the Defendant knew that the CMI in the file names of the pieces had been altered to include the wording "YTS", "RARBG" and "STUTTERSH*T" .

126.   Particularly, the Defendant distributed the file names that included CMI that had been altered to include the wording "YTS", "RARBG" and "STUTTERSH*T" .

127.   Defendant knew that the wording "YTS" and "RARBG" originated from the notorious movie piracy websites for which she had registered accounts.

128.   Defendant knew that the use of Popcorn Time would result in distribution of file names of altered CMI since she promoted Popcorn Time for the purpose of piracy.

129.   Defendant knew that the use of Popcorn Time would result in distribution of file names of altered CMI since she was terminated from her employment for this conduct.

130.   Defendant's acts constitute violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

131.   Plaintiffs are entitled to an injunction to prevent Defendant from engaging in further violations of 17 U.S.C. § 1202.

20-017G

132.   Plaintiffs are entitled to recover from Defendant the actual damages suffered by Plaintiffs and any profits Defendant has obtained as a result of her wrongful acts such as bonuses and/or commissions she received from her employment that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendant has realized by her violations of 17 U.S.C. § 1202.

133.   Plaintiffs are entitled to elect to recover from Defendant statutory damages for her violations of 17 U.S.C. § 1202.

134.   Plaintiffs are further entitled to costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully requests that this Court:

(A)  permanently enjoin Defendant from continuing to infringe and/or contribute to infringement of the Plaintiffs' copyrighted Works and violating the integrity of the copyright management information of their Works;

(B)  order that Defendant delete and permanently remove the torrent file relating to the Plaintiffs' copyrighted Works and the BitTorrent Client from each of the computers under Defendant's possession, custody, or control;

(C)  order that Defendant delete and permanently remove the copies of the Works Defendant has on the computers under the Defendant's possession, custody, or control;

20-017G

(D) award each of the Plaintiffs statutory damages of $150,000 pursuant to 17 U.S.C. § 504-(a) and (c);

(E) award each of the Plaintiffs Hunter Killer, Bodyguard, Morgan Creek and Rambo statutory damages of $25,000 pursuant to 17 U.S.C. §1203(c)(3)(B);

(F) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. §§ 505 and 1203(b)(5); and

(G) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, April 29, 2021.

CULPEPPER IP, LLC

/s/ Kerry S. Culpepper
Kerry S. Culpepper
Attorney for Plaintiffs

27

20-017G



**RECEIVED**

KERRY S. CULPEPPER

MAY 0 5 2021

ADMITTED TO PRACTICE IN VIRGINIA, HAWAII
AND BEFORE THE USPTO

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ PM
DEPUTY CLERK

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HI 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

PATENTS, TRADEMARKS & COPYRIGHTS

<u>Via Priority Mail</u>

April 29, 2021


Attn: Clerks Office

United States District Court – Western District of Texas

525 Magoffin Avenue, Suite 105

El Paso, Texas 79901


Re:  Submission of Amended Complaint for Case No.: 3:20-CV-00306-FM

Dear Sir or Madam,

I have attached an original copy of the First Amended Complaint ("FAC") for filing along with two copies.  Since the FAC joins additional Plaintiffs, I am not able to file it by ECF.  Please contact me by telephone or e-mail if there is an issue.  I will pull the filed copy from Pacer so I do not need a stamped copy sent back to me.


Best regards,

Kerry S. Culpepper, #9837

kculpepper@culpepperip.com

This envelope is made from post-consumer waste. Please recycle - again.

**UNITED STATES POSTAL SERVICE**

**P** *Retail*

**US POSTAGE PAID**
**$7.95**

Origin: 96740
04/29/21
1430000350-27

**PRIORITY MAIL 3-DAY®**

EXPECTED DELIVERY DAY: 05/04/21

1 Lb 8.70 Oz

C015

1006

**PRESS FIRMLY TO SEAL**

**FLAT RATE**
**POSTAGE REQUIRED**

SHIP
TO:
525 MAGOFFIN AVE
RM 105
El Paso TX 79901-2578

**USPS TRACKING® #**

9505 5125 9928 1119 7253 85

P S00001000014

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

* Domestic only.   × For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 4 lbs.

• Order supplies online.*
• When used internationally, a customs declaration label may be required.*

* Domestic only

**RECEIVED**

MAY 05 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY CLERK

To schedule free
Package Pickup,
scan the QR code.

USPS.COM/PICKUP

**FROM:** Culpepper IP, LLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, HI 96740

**TO:**
Attn: Clerks Office
United States District Court – Western
District of Texas
525 Magoffin Avenue, Suite 105
El Paso, Texas 79901